IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TOMMY ROBINSON #226992        :
    Plaintiff,

                        :

      v.                    Civil No. DKC-10-3223

                        :

WESTERN MARYLAND HEALTH
SYSTEM CORP.[1]            :
DR. BALJEET S. MAHAL
DR. STEVEN R. SMITH      :
DR. STANLEY J. MATYASIK
KIM BITTNER             :
CATHY HUNTER
BECKY VIOLANTE         :
DR. THOMAS LUNDQUIST
DR. ISAIAS TESSEMA       :
DR. LAMEH FANANAPAZIR
    Defendants

## MEMORANDUM OPINION

## I.    Procedural History

Plaintiff Tommy Robinson, a Maryland Division of Correction prisoner confined at the Western Correctional Institution in Cumberland (WCI), is no stranger to the litigation process, having filed dozens of actions both here and in the Maryland district and circuit courts over the past two decades.[2] In this action he seeks compensatory and punitive damages[3] as well as

---

[1] The Clerk shall amend the docket to substitute Western Maryland Health System Corporation for Defendant Sacred Heart Hospital Hospital Administrator, and to reflect the full and correct spelling of other Defendants' names.

[2] At least seven of his federal civil rights actions involved claims against prison health care providers. *See Robinson v. Prison Health, et al.,* Civil Action No. AW-95-3449 (D. Md.); *Robinson v. Prison Health, et al.,* Civil Action No. AMD-96-170 (D. Md.); *Robinson v. EMSA Correctional Care,* Civil Action No. AMD-97-3524 (D. Md.); *Robinson v. Adegboyegg-Panox, et al.,* Civil Action No. AMD-00-727; *Robinson v. Ayalew, et al.,* Civil Action No. AMD-00-3101 (D. Md.); *Robinson v. Medical Staff MHC-X*, Civil Action No. AMD-03-2863 (D. Md.); and *Robinson v. Medical Staff c/o Prison Health Services,* Civil Action No. AMD-03-3166 (D. Md.).

[3] Robinson seeks $1,000,000 "jointly and severally" from Defendant Western Maryland Health System Corporation personnel; $250,000 jointly and severally against "defendants of the Allegany Cardiology Center;" $500,000 against Defendant Lundquist, and $250,000 against Defendant Tessema. Robinson also seeks $100,000 in punitive damages from each Defendant and "proper [medical] treatment," an "order from the court to receive tests that will prove my medical cond[ition]," including a full body "MRI and a barium [enema] test," and a copy of his entire medical record. ECF No. 1 at 4, 10, and 12-13. The Department of Public Safety and Correctional Services

injunctive relief for alleged injuries to his shoulder, neck, hip and spine that went untreated following a fall from a hospital bed during his November, 2007, admission to Sacred Heart Hospital.  The unverified Complaint encompasses claims arising under state tort law governing negligence as well as constitutional Eighth Amendment claims made applicable under provisions of the federal Civil Rights Act, 42 U.S.C. § 1983.

Robinson names as Defendants Western Maryland Health System Corporation (improperly identified as "Sacred Heart Hospital/Hospital Administrator") and its staff members, Dr. Steven R. Smith, Kim Bittner, Cathy Hunter and Becky Violante ("the Hospital Defendants");  Dr. Baljeet S. Mahal[4] and Dr. Lameh Fananapizir; Dr. Stanley J. Matyasik;[5] Dr. Thomas Lundquist, a former employee of Wexford Health Sources, Inc. (Wexford);[6] and Dr. Isaias Tessema, an employee of Correctional Medical Services, Inc. (CMS), the prison health care provider under contract with Maryland's Department of Public Safety and Correctional Services (DPSCS).[7]  Defendants have filed dispositive motions[8] (ECF Nos. 12, 13, 14, 22, 23, 26

---

("DPSCS") provides a mechanism for prisoners to review and receive copies of their medical records.  ECF No. 12, Exhibit D. Although Robinson states he has requested his records, he is advised formally to request review of his records in accordance with DPSCS policy.  *See* Division of Correction Directive (DCD) 130-600.  Robinson may wish to contact his case manager for information on  initiating a medical records request.

[4]  On December 3, 2007,  Dr. Mahal read Robinson's echocardiogram and completed a written report concerning the results.  ECF No. 13, Exhibit A.  Dr. Fananapazir also treated Robinson during this time, performing a coronary arteriogram and and inserting an intra-aortic ballon pump during a procedure performed on November 29, 2007.  *Id.,* Exhibit B.  Presumably both physicians have privileges at but are not directly employed by the hospital.

[5]  Although not apparent from the record, the court presumes Dr. Matyasik had privileges at the hospital and treated Robinson there.

[6]  Wexford, working under contract with Maryland's Department of Public Safety and Correctional Services, provides onsite utilization review management services to arrange offsite medical and clinical services, including hospitalizations and specialized medical and clinical services, to Maryland prisoners.  At the times relevant to this case, Dr. Lundquist served as Wexford's vice president and chief medical officer.  While he did not routinely participate in prisoner health care decisions or collegial reviews of healthcare requests, he was responsible for establishment and oversight of Wexford's collegial review and peer review programs and the company's clinical protocols.  ECF No. 26, Exhibit 3.

[7]  During the period relevant to this suit, Dr. Tessema was the medical director for the Western Maryland region, including WCI, where Robinson is incarcerated.  He currently is the regional medical director for the Western region and the Hagerstown region.  ECF No. 29, Exhibit A.

and 29), which Robinson opposes.[9]   ECF No. 40.   The motions may be decided without a hearing.   *See* Local Rule 105.6 (D. Md. 2010).

## II.   Standard of Review

### Motion to Dismiss

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to prove the 'grounds' of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."   *Bell Atlantic Corporation v. Twombley*, 550 U.S. 544, 554, 127 S.Ct. 1955, 1964-65 (2007).    "[S]omething beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a 'largely groundless claim' be allowed to 'take up the time of a number of other people...'"   *Id*. at 557-558  (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)).   "[T]hreadbare recitals of the elements of a cause of action, supported by mere statements, do not suffice."   *Ashcroft v. Iqbal*, --- U.S. ---, ---, 129 S.Ct. 1937, 1949 (2009).   In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff."   *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).   However, "because the court is testing the legal sufficiency of the claims, the court is not bound by plaintiff's legal conclusions."   *Takacs v. Fiore*,  473 F.Supp.2d  647, 651 (D. Md.  2007).

---

[8]   The Hospital Defendants and Defendants Matyasik, Mahal and Fananapazir have filed motions to dismiss.   The remaining Defendants have filed motions to dismiss or for summary judgment which shall be construed as motions for summary judgment.

[9]   Defendant Lundquist has submitted a reply to Robinson's opposition response.  ECF No. 41.

**Motion for Summary Judgment**

Under the December 10, 2010 revisions to Fed. R. Civ. P. 56(a):

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).

## III. Analysis

<u>Medical Negligence Claims</u>

Plaintiff was hospitalized at Sacred Heart Hospital from November 28, 2007 through December 4, 2007, for chest pain and arterial flutter. While there, he underwent several

procedures, including an echocardiogram and arteriogram. Plaintiff claims that on November 29, 2007, while under sedation for one of these procedures, he fell from a table and suffered injury to the right side of his body, including his hip, arm, neck, back and shoulder. He also claims that during this time he developed blockage of the colon. He contends that the Hospital Defendants and the physicians who treated him at Sacred Heart Hospital during this time violated the standard of care by failing properly to secure him during the medical procedure, failing to order proper diagnostic studies to determine the extent of injuries sustained during the fall, and failing to order proper diagnostic studies to determine if his colon was obstructed.[10] He further contends that following his discharge from Sacred Heart, he continued to complain of right side pain and was denied MRIs of his entire body as well as a CT scan of his abdomen and a barium enema to diagnose colon blockage by CMS Defendant Tessema and Wexford Defendant Lundquist.

There is no indication that Robinson's medical negligence claims are premised on diversity jurisdiction under 28 U.S.C. § 1332. Assuming supplemental jurisdiction is derived pursuant to 28 U.S.C. § 1367 based on the coexistence of Robinson's Eighth Amendment claim, the court is nonetheless constrained from considering the medical negligence claims on the merits for two reasons.

First, the Maryland Health Care Malpractice Claims Act (Act), Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.*, requires that all claims against a health care provider for medical injury where monetary damages of more than $30,000 are alleged must be submitted to the Health Care Alternative Dispute Resolution Office as a condition precedent to any judicial action. *See id.* at § 3-2A-02; *see also Roberts v. Suburban Hospital Assoc., Inc.*, 73 Md. App. 1,

---

[10] Robinson infers that the Hospital Defendants and his attending physicians did not order additional tests because payment for such tests was denied by Wexford personnel. ECF No. 1 at 8 and 12. Nothing in the record supports this claim.

3 (1987); *Davison v. Sinai Hospital of Balt. Inc.*, 462 F. Supp. 778, 779-81 (D. Md. 1978), *aff'd*, 617 F.2d 361 (4th Cir. 1980). This requirement applies to claims of medical negligence filed in federal court. *See Davison*, 462 F. Supp. at 779-81. When assessing a claim for medical malpractice, a court is required to focus on "whether the claim is based on the rendering or failure to render health care and not on the label placed on the claim." *Brown v. Rabbit*, 300 Md. 171, 175 (1984). A court is required to dismiss an action for noncompliance with the Act where a party has failed to exhaust his or her administrative remedies under the Act. *See Roberts,* 73 Md. App. at 6; *see also Davison*, 462 F. Supp. at 781. As the proper standards of medical care are implicated here, the claims are subject to the Act's requirements.

Second, the medical negligence claim has already been the subject of state court litigation, precluding its reexamination here. On September 2, 2009, Robinson filed a nearly identical Complaint against the same Defendants in the Circuit Court for Allegany County. *See Robinson v. Sacred Heart Hospital, et al.,* No. 01-C-09-033138-DJ). Defendants filed dispositive motions arguing, *inter alia*, that Robinson failed to follow the mandatory requirements of the Act as noted above. Robinson then amended the Complaint to limit his damages claim to no more than $30,000, thus avoiding the requirement of administrative exhaustion set forth in the Act. On November 15, 2010, Robinson filed his hybrid civil rights and negligence claim here, stating that the Allegany County lawsuit had been withdrawn without prejudice. ECF No. 1 at 2. This statement is incorrect; summary judgment was granted in favor of Defendants on April 14, 2011, and the Allegany County case closed.[11]

Based on the foregoing, Robinson's medical negligence claims are dismissed here as to all Defendants.

---

[11] *See* http://casesearch.courts.state.md.us/inquiry/inquiry-index.jsp. Robinson did not note an appeal of the final decision.

<u>Eigth Amendment Claims</u>

Robinson's civil rights allegations fare no better.  In order to state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins,* 487 U.S. 42, 48 (1988).  Clearly the private hospital and the medical personnel working therein are not "state actors" amenable to a civil rights claim.  Thus, Robinson cannot pursue a civil rights claim for damages against Defendants Western Maryland Health System Corporation, Mahal, Smith, Matyasik, Bittner, Hunter, Violante and Fananapazir.

Defendants Lundquist and Tessema, however, are employed by companies under contract with the DPSCS, and are amenable to suit under § 1983.  To demonstrate that Lundquist and Tessema denied his Eighth Amendment right to necessary medical care, Robinson must prove two essential elements.  First, he must satisfy the "objective" component by illustrating a serious medical condition.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998).  If he proves this first element, Robinson must then prove the second "subjective" component of the Eighth Amendment standard by showing deliberate indifference on the part of Defendants.  *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06).  "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837.  Medical staff are not, however, liable if they "knew the underlying facts but believed

(albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844; *see also Johnson v. Quinones*, 145 F.3d at 167. Further, when "it appears from the entire record that the prison medical authorities have made a sincere and reasonable effort to handle plaintiff's medical problems, plaintiff's constitutional rights have not been violated pursuant to 42 U.S.C. § 1983." *Bennett v. Reed*, 534 F. Supp. 83, 87 (E.D. N.C. 1981), *aff'd*, 676 F.2d 690 (4th Cir. 1982).

Defendant Tessema, an employee of CMS, has submitted an uncontroverted affidavit and medical records demonstrating that Robinson has received constitutionally adequate health care. Plaintiff has a history of backache, osteoarthritis,[12] diverticulosis,[13] benign prostatic hypertrophy ("BPH"),[14] hypertension, morbid obesity, diabetes, constipation, and cardiomyopathy (disease of the heart muscle). ECF No. 29, Exhibit B at ¶ 3. From December 2007 to February 2011, Robinson filed approximately 65 Sick Call Request Forms noting, among other things, the following complaints: (1) pain in his neck, back, right hip, knees, chest, both feet, and all over his body; (2) insomnia; (3) nerve damage in his feet; (4) numbness of the left leg; (5) constipation; (6) diarrhea; (7) Crohn's disease (a digestive disorder); (8) difficulty breathing at night; and (9) stomach pain and bloating. *Id.* at ¶ 4. From December 2007 to the present, Plaintiff has requested the following accommodations for his medical complaints: "feed-in" (receiving meals in his cell); a handicapped cell; a cell closer to the medical unit and the dining

---

[12]   Osteoarthritis is a degenerative disease of the joints. It is the result of the loss of cartilage in the joints which causes the bones to rub together.  Age, obesity, and familial predisposition are factors that can cause or aggravate osteoarthritis.

[13]   Diverticulosis is a condition in which pouches (diverticulae) form in the wall of the colon (large intestine).  Diverticulosis might not be discovered unless symptoms develop, such as painful diverticular disease or diverticulitis.

[14]   BPH is a non-cancerous enlargement of the prostate gland.

hall; crutches; a wedge pillow; an egg-crate foam mattress; a plastic chair in his cell for him to sleep in; surgery on his colon; a "breathing machine"; "Resource", a liquid nutritional supplement; an orthopedic consultation; a gastroenterology consultation; MRI studies of his spine and neck; knee braces; a medical mattress; Naprosyn; a back brace; a barium enema; a walker with wheels and a seat; a wheelchair and a "pusher";[15] a cane and a rubber tip for the cane; a gel cushion for his wheelchair; a CT scan of his colon; and ice for his neck, knees, back, and lungs. *Id.* at ¶ 5.

Plaintiff's numerous Sick Call Request Forms do not reference the alleged November 28, 2007, incident at Sacred Heart Hospital in which he allegedly fell and injured himself. *Id.* at 12. As noted by Defendant Tessema, the Sick Call Request Form includes a space labeled "When did it [the pain or complaint] start?" *Id.* Plaintiff never wrote "after I fell at the hospital" or any similar reference. *Id.* The Sick Call Request Form for December 5, 2007 – a week after the alleged fall – does not reference a fall.[16] *Id.*

Defendant Tessema has outlined the medical care Robinson has received to address this medical concerns listed above. His affidavit, supported by the medical record provided as Exhibit B, demonstrate that Robinson has received a great deal of specialized health care despite his status as a prisoner.

Since his 2004 barium enema, Robinson has complained that he has strictures of his bowel and that he needs surgery to correct this condition. This enema, however, showed no such result, but revealed multiple small diverticulae in the sigmoid (the lower part of the colon) and descending colon (where feces is stored). It showed no mucosal abnormalities and no

---

[15] A "pusher" is a fellow prisoner assigned to push another prisoner's wheelchair.

[16] Given Robinson's litigious nature, his ability to express himself in writing, and his knowledge of basic medical protocols, his failure to list a fall at the Hospital as the source of his medical problems soon after his return from his cardiac procedures casts serious doubt as to whether a fall actually occurred. Whether he fell, however, does not affect the outcome of this case.

diverticulitis.[17]  No indication of strictures or narrowing was found.  ECF No. 29, Exhibit B, p. 1. Defendant Tessema indicates that while strictures can cause some of the symptoms of which Robinson complains, such as diarrhea or constipation, strictures would have caused his physical condition to worsen significantly over a period of six years, which it has not done. Additionally, patients with strictures often present with severe abdominal pain and vomiting, which Robinson does not exhibit.  An abdominal X-ray taken on February 3, 2010, revealed a fecal impaction, which can also produce the symptoms Robinson has exhibited, and Robinson was given Magnesium Citrate, a laxative, to increase the water in the intestines.  *Id.,* Exhibit B, pp. 128, 130-31.  If Robinson had suffered strictures of the bowel at that time, they would have shown up on the X-ray as dilated loops of bowel.  Likewise, Robinson claims he has Crohn's disease.  No health care provider has made any notation of suspected Crohn's disease in Robinson's chart. Patients with Crohn's disease exhibit pain with bowel movements, persistent watery diarrhea, unintentional weight loss, anorexia (loss of appetite), fever, and bloody stools.  Except for constipation and diarrhea, Robinson does not have any of the symptoms of intestinal strictures or Crohn's disease.  Robinson has only complained of diarrhea once (on December 3, 2009) since December 2007. *Id*., Exhibit B, pp. 100, 130.  Moreover, in July and October 2009, Robinson's weight was 253 pounds. On July 27, 2010, he weighed 291 pounds. Robinson's most recent weight was 295 pounds. *Id*., Exhibit B, pp. 4, 6, 66, 88, 169, 176-203. According to Tessema, he therefore has not demonstrated the weight loss associated with Crohn's disease. Indeed, Robinson has gained weight, coinciding with with his use of a wheelchair, which was first given to him on September 22, 2009.  Metamucil, a fiber laxative, and Lactulose have been prescribed for Robinson's constipation. On January 3, 2010, the Department of Corrections questioned why

---

[17]  Diverticulitis is the acute, symptomatic form of diverticulosis.

Robinson needed a laxative that was non-formulary.[18]  As a result, Robinson's laxatives were changed to Hydrocil Instant, another type of fiber laxative, and Constulose, another name for Lactulose.  Robinson alleges that he is not constipated, but he has requested that the dosage of his laxatives be increased or has complained that he ran out of them three times since August 2008.  *Id.*, Exhibit B, pp. 5, 8, 10-11, 17,20,27-34,42,44,46-47,49,58-59,62,67,76,83,85, 89, 95, 103, 112, 117, 126,130,145,152,157,164,170,176-77,183-84,188, 194-95,204.

On August 23, 2010, Robert Chou, M.D. ("Dr. Chou"), a gastroenterologist, evaluated Robinson.  Dr. Chou noted that Robinson complained of a decreased caliber of his stool, and that Robinson offered no complaint of abdominal pain, even upon palpation.  Dr. Chou observed that Robinson was a poor historian, meaning that he was unable or unwilling to give a useful history of his own medical condition and symptoms.  Dr. Chou recommended a colonoscopy with monitored anesthesia care because of Robinson's cardiac condition.  Dr. Chou performed the colonoscopy on October 6, 2010.  The results of the colonoscopy showed that Robinson has mild left-sided diverticulosis.  There were no other abnormalities.  Dr. Chou did not recommend any treatment, but did recommend a repeat colonoscopy in five years.  On October 8, 2010, Ava Joubert, M.D. ("Dr. Joubert"), noted the results of the colonoscopy and increased Robinson's Lactulose to three times a day.  On October 13, 2010, Dr. Joubert discussed the colonoscopy findings with Robinson and gave him a copy of the report.  *Id.*, Exhibit B, pp. 165-66, 178-79, l86-90.

Defendant Tessema notes that Robinson complains frequently of pain in many parts of his body, primarily his knees and spine.  ECF No. 29, Exhibit A at ¶ 13.  An X-ray of the left knee showed osteoarthritic changes.  *Id.*  On January 10, 2008, a knee brace, Size XXXL, was

---

[18]  The State of Maryland has a list of medications that are typically prescribed for certain illnesses; these medications are "formulary" medications. All other medications are considered to be "non-formulary."

ordered. *Id.* at ¶ 14. Robinson returned these braces on February 28, 2008, stating that they were too small. *Id.* The knee braces did not come in a larger size, so the order was canceled. *Id.* On February 20, 2009, Plaintiff again requested and received XXXL knee braces. *Id.* Another set of knee braces was given to Plaintiff on February 26, 2010. *Id.* Orthopedic appliances such as knee braces can be replaced yearly. *Id.*

Plaintiff has been prescribed Naprosyn[19] for his complaints of pain, as well as Tylenol #3 (Tylenol with codeine, a narcotic), Toradol,[20] and Robaxin (a muscle relaxant) after a fall in his cell. *Id.* at ¶ 15. Plaintiff requested an increase in his Naprosyn dosage on September 10, 2008. *Id.* Dr. Tessema increased the dosage from 250 mg once a day as needed to 375 mg once a day as needed. *Id.*

On December 23, 2009, Plaintiff was examined by an orthopedic surgeon, who recommended an MRI of Plaintiff's cervical and lumbar spine. *Id.* at ¶ 16. This MRI was performed on March 29, 2010. *Id.* X-rays of Plaintiff's spine have shown mild degenerative joint disease at all levels, and degenerative disc disease with marked disc space narrowing in his lumbosacral area. *Id.* These studies showed a small central disc protrusion at the level of C5-6, with very minimal compression of the spinal cord, and at L3-4, and L5-S1, with no significant compression of the spinal cord.[21] *Id.* Neither surgery nor steroid injections are required for these conditions.

Robinson has received assistance with his activities of daily living, to wit: a bottom bunk, cuff-in-front, ground floor cell, and ground floor shower, on August 12, 2008 and renewed on

---

[19] Naprosyn is a non-steroidal anti-inflammatory (NSAID) medication, commonly used to treat osteoarthritis.

[20] Toradol is another type of NSAID, for short-term treatment of moderate to severe pain.

[21] The letters C, L, and S indicate the cervical, lumbar, and sacral vertebrae, and the numbers refer to the particular vertebrae involved.

July 15, 2009; a cane, on November 19, 2008; transfer to a handicapped cell with handrails on April 26, 2009; boots with ankle supports, on July 15, 2009; a wheelchair to use for one year, on September 22, 2009; a wedge pillow on October 1, 2009; a wheeled walker to use for one year, on November 10, 2009 and renewed on November 17, 2010; a wheelchair pusher on December 15, 2009 and renewed on December 2, 2010; a custom chair back brace on December 15, 2009; morning feed-in for five months, on December 15, 2009 (extended for one year on April 6, 2010); a gel mattress on January 14, 2010; a walker with four wheels and a wheelchair pusher on January 26, 2010; a new wedge pillow on February 2, 2010; knee braces on November 17, 2010; wheelchair gloves on November 17, 2010; and a wheelchair gel cushion on November 17, 2010. Plaintiff received a back brace on December 17, 2010. *Id.* at ¶ 17.

On October 13, 2010, Dr. Joubert evaluated Robinson for symptoms of a cold and submitted a request for Plaintiff to undergo a sleep study to determine whether he has sleep apnea.[22] The sleep study was conducted on December 8, 2010, and showed that Robinson has severe obstructive sleep apnea, and would benefit from a Continuous Positive Airway Pressure ("CPAP") machine.[23] On December 29, 2010, Dr. Joubert submitted a request for CPAP machine for Robinson. The medical staff is in the process of acquiring additional technical requirements needed for the CPAP machine before it will be ordered. *Id.*

Record evidence shows that Robinson has consistently been evaluated and treated appropriately, and has received adequate accommodations for medical needs. Robinson's mere disagreement with his treatment is insufficient to support a claim under § 1983. Defendant

---

[22] Sleep apnea is a condition in which the airway becomes blocked or collapses during sleep, causing shallow breathing or pauses in breathing.

[23] A CPAP machine uses a mask that fits over the patient's mouth and/or nose. The machine gently blows air into the patient's throat. The air presses on the wall of the airway. The air pressure is adjusted so that it is enough to stop the airway from becoming narrowed or blocked during sleep.

Tessema is entitled to judgment as a matter of law because the undisputed material facts show that the allegations against Dr. Tessema cannot satisfy the standard for deliberate indifference required to state a § 1983 claim under the Eighth Amendment.

Robinson claims that Defendant Lundquist did not approve a request for an MRI submitted by Dr. Hubert Mickel on July 1, 2009, some twelve days before Lundquist left Wexford. ECF No. 40 at 2. He also claims that Lundquist should be held accountable for the decisions of other Wexford employees during the period relevant to the Complaint. *Id.* As noted above, Robinson did receive an MRI on March 29, 2010, and has received treatment in response to the findings of that diagnostic study. There is simply no basis to find that Lundquist was responsible for any denial of medical care involving Robinson.

## IV.   Conclusion

For reasons set forth herein, Defendants' dispositive motions shall be granted and the case closed. A separate Order shall be entered reflecting this Memorandum Opinion.


Date:   July 8, 2011                                    /s/
                                     DEBORAH K. CHASANOW
                                     United States District Judge